PFNDHFTON, President.
(After stating the case, and mentioning that the Court were unanimous as to their judgment and the principles on which it was founded.) Delivered the resolution of the Court as follows:
We lay down this general proposition, that where a creditor takes no specific security from his debtor, he trusts him upon the general credit of his property, and a confidence that he will not diminish it to his prejudice. He has therefore a claim upon all that property, whilst it remains in the hands of the debtor; and may pursue it into the possession of a mere volunteer; but, not having restrained the debtors power of alienation, if he or his volunteer convey to fair purchasers, they, having the law and equal equity, will be protected against the creditors.
We then proceed to consider whether the sons Richard and David were such purchasers for a valuable consideration?
1. As to Richard.
There can be no objection to his consideration ; It is natural affection, marriage, and money paid. But the objection is, that the deed was not recorded within eight months from the sealing and delivery thereof; and therefore, by the express words of the act of Assembly, is void as to creditors. If the fact be so, the operation of the law is positive, since it comprehends all creditors; although in reason, the recording would seem to affect only mesne creditors, between the date and recording.
We consider this deed to have been sealed and delivered on the 21st of March 1786, and that *the recording, within four months afterwards, complied strictly with the law. The term re-acknowledgment seems to have produced, in the mind of the Chancellor, mistaken ideas. He understands it as meaning no more, than that Richard the father, on the 21st of March, acknowledged that he had, on the 20th of September before, sealed and delivered that deed. A mistake, which information from our clerk would correct. It would be, that when a man comes into Court to acknowledge a deed, the question put to him is not, whether, he delivered the deed at the date? but whether, he then acknowledges the indenture to be his act and deed? So the oath to the witnesses is, that they saw the bargainor seal and deliver the paper as his act and deed. Such was the oath administered to Currie and the other witnesses to this deed. When did they see it sealed and delivered? Not on the 20th of September 1785; (for then they were not present, and other witnesses attested that delivery;) but on the 21st of March when they subscribed it, noting, upon the paper, the day of the delivery which they attested.
It is admitted, by the Chancellor, that if this deed had been cancelled and a new one made, it would have been good. This the council also admit; but pursuing the Chancellors idea, they have produced a number of cases, some stating that, between the date and recording, the estate is in the bargainor; others that it is in the bar-gainee; and others still, that it is in suspense.
Heaving it to others to reconcile this clashing jargon, we consider what would be the opinion of a plain man on the occasion? It would be, that the estate was in the bargainee whilst he held the deed, which was the evidence of it; but, when he surrendered that deed to the bargainor, his legal title ceased, and the other was at liberty to convey to him, or any other: And if to him, might either destroy that deed and make a new *one, or, by a re-execution of the same paper, give it force, as a new deed from that period.
The reason mentioned for such re-execution, to increase the number of witnesses, applies in this case, and repels a suspicion *287 of fraud.- The deed was to be recorded in Richmond, where all the courts were held for its admission; the eight months were near expiring, and only three witnesses to the deed; two of which resided at a considerable distance, and might not be had in time, the eight months being nearly run out.
What difference can it possibly make, between a new deed and the old one re-executed? Mr. Wickham stated two; in both of which the old deed is best.
First, he justly complained of the practice of renewing deeds from time to time, and keeping them secret; by which means, creditors and purchasers may be deceived, and against which Chancery will relieve as a fraud. But this will apply equally with respect to both cases; with this difference, that in case of new deeds each time, it might be difficult to prove the renewals; whereas the old deeds re-executed shew the progress from the first date and is more beneficial to the creditors.
The same observation applies to his other case. That of a mesne purchaser from the bargainee; since the renewed deed would shew an existing Title, at the time of his purchase.
Upon the whole we are of opinion, that the deed is to be considered, to every intent and purpose, as a deed of the 21st of March 1786 and not before; that it was, therefore recorded, in due time; and that Richard is to be considered as a purchaser for a valuable consideration.
2. As to David;
Being at liberty to aver and prove the real consideration, he has satisfactorily proved the deeds *to have been in consequence of a marriage agreement between the fathers of himself and his lady; and he is to be considered as a purchaser for a valuable consideration also:
It therefore only remains to enquire, whether at the time of their purchase, there was such a lien upon the land, by the judgment, as restrained the alienation of Richard the elder?
Hansbury’s judgments are the great subject of controversy. They were entered in July 1770, when an elegit could not issue upon them, into any other county than York ; and therefore in reason and justice could only bind the lands in that county: And this is not contradicted by authority shewing, that judgments in England, entered in the Courts of General Jurisdiction over the whole nation, bind the lands throughout.
The act of 1772, however, changed the principle, and by permitting the elegit to run into other counties, is supposed at present, but not decided, to extend the lien to all the lands in the country; and that Hanbury had a right, in July 1772, (that being the last day to which the executions were to be staid,) to sue out an elegit, on those judgments, into any other county.
We are then to enquire, what he was to do, in order to preserve his lien?
He was either to issue his elegit within a year, which expired in July 1773, or to enter upon the roll in England, or in the record book here, that he elected to charge the goods and half the lands; which would be equal to issuing the elegit. If he did neither, he might, on motion, be allowed to enter the election nunc pro tunc; but, in the latter case, if there had been an intervening purchaser, the motion would have been denied, upon the principles of relation : Which being a legal fiction, contrived to support justice, is never to be admitted to do an injury to a third person.
*But the creditor here has taken no steps; he has sued out no execution ; has made no election upon record. The judgments have long since expired; and no scire facias taken out to renew them. If he had done so. the lien would have been revived; but to operate prospectively, and not to have a retrospective effect, so as to avoid mesne alienations.
So that we can with great propriety, say, in the language of Chief • Baron Gilbert, that these judgments over-reached nothing; and did not prevent the fair purchases of the sons in 1780 and 1786, unless the causes, assigned in the replication, should be a sufficient excuse for the delay.
Presuming that if this constructive notice from dormant judgments will bind a purchaser at all (contrary to what is said in 3 Bac. 645 and 646, that express notice is necessary,) it ought to be taken strictly and not expended by equity, we proceed to enquire into the facts.
Prom July 1772 to April 1774, there is no excuse. This is 21 months, during which the judgments expired and the lien was at an end: if it could be revived by a scire facias on the judgment which has never been issued.
Admitting bis excuses to be good, from April 1774 to 1791, they ceased to operate from the latter period. At that time, if he had sued out his scire facias, there were lands in the hands of the devisees, which he might have charged in exoneration of the purchases. But by lying bye, until 1797, he suffered them to be exhausted, by other creditors, by bond (for the proceedings against them are all subsequent to 1791;) and now comes into equity to set up his lien against purchasers. This appears, to me, to be contrary to every principle of law and equity.
The other judgment creditors are liable to the same objection, of not having kept their liens alive, by the means before stated.
*The decree of the Chancellor ought therefore to be reversed, so far as it concerns the conveyance to Richard Randolph the son, and he and those claiming under him are to hold the estate according to the deed; But the decree is to be affirmed as to the residue; with this reservation, as to the claim of Wayles’s executors, that they are to be considered as bond creditors, standing in the place of Bevins, so far as may affect the distribution of assets remaining ; but not so, as to charge the executors with a devastavit, on account of payments, or judgments to simple contract creditors.
The decree was as follows:
“The court is of opinion, that the deed, from Richard Randolph the elder to Richard the younger, was made upon good and valu *288 able consideration,- and was binding- upon the creditors of the father, having -been duly recorded within eight months from the twenty first day of March 1786; when the said deed was re-executed by sealing and delivery and attested by new -subscribing witnesses, and ought to be considered, to every intent and purpose, asa new deed of that date. That, although-, the deeds for- David Meade Randolph expressed the considerations to be for natural affection and advancement in life, he was, nevertheless, at liberty to aver and prove an additional consideration; and having established, by satisfactory proof, that the said deeds were made in consequence of a treaty of marriage between the fathers of him and his lady, he is to be considered as a bona fide purchaser of the estates. That the said purchasers are .not to be affected by the supposed lien upon the lands from the judgments in the proceedings mentioned, such lien not existing at the time of their respective purchases, -for the reasons stated in ■ the decree of the said High Court of Chancery. That the appellees, executors of John Wayles, ought to stand in- the ">:'place of James Bevins, and be considered as bond creditors, so far as may. affect the distribution of remaining assets; but not so as to charge the executors with a devastavit, on account of payments or judgments to simple contract creditors; and that there is error in so much of the decree aforesaid as declares the deed to Richard Randolph the son void as to creditors, and directs a sale of the lands by commissioners, and the application of the money to the benefit of the ap-pellees, and as to so much as subjects the money for which the land called Elams* devised by Richard Randolph the father to his son David Meade Randolph hath been sold by him, to the payment of the demand of the appellees, the court being of • opinion, that the money, for which the said land was sold, is only liable to the demand of the appellees, if it has not already been applied to- the payment of debts which bound the devisee. Therefore it is decreed and ordered, that so much of the said decree as is herein stated to be erroneous be reversed and annulled, that the bill be dismissed as to the appellants; that the residue of the said decree- be- affirmed, with the reservation herein before stated, as to the executors of John Wayles; and that the appellees pay to- the appellants the costs expended in the prosecution of the appeal aforesaid here.”
- In the suit of Beverley v. Eppes the decree was as follows.
*“ The court is of opinion that-the said decree is erroneous. Therefore it is decreed and ordered that the same be reversed &c. and this • court proceeding to make such decree as the said High Court of Chancery ought to have pronounced. It is further, decreed and ordered that, the deed from Richard Randolph the father to Richard Randolph the son, mentioned in the proceedings, be established. And the cause is remanded to the. said High Court of Chancery, for the appellants to proceed further therein for the compensation prayed in their bill, if they shall think proper.”

The decree of the Court of Chancery as to this part of the case was in the following- words. “The money for which the land called Elams, which was devised by Richard Randolph the father to his son David Meade Randolph, hath been sold by him, is liable to the plaintiffs demands. ”
And the devise to David Meade Randolph was in the following words, “I give to my son David Meade Randolph and to his heirs forever, my tract of land called Elams, in the county of Chesterfield, containing by estimation one hundred and thirty acres.”